Statement.

# Richmond

## YELLOW POPLAR LUMBER COMPANY V. GOBLE.

### November 20, 1913.

Absent, Keith, P.

1. MASTER AND SERVANT—*Personal Injury—Negligence—Accident.*— Negligence of the master cannot be inferred from the mere occurrence of an accident by which his servant is injured. That fact alone does not raise even a *prima facie* presumption that the master has been guilty of negligence or a breach of duty to his servant. Negligence of the master is an affirmative fact to be established by the injured servant.

2. MASTER AND SERVANT—*Negligence of Master—Evidence—Unforeseeable Event—Case at Bar.*—Negligence must be established by affirmative evidence, which must show more than a mere probability of a negligent act. The existence of negligence must not be left wholly to conjecture, and, in determining whether or not an act or omission of the master was negligent, it must be borne in mind that the master is not compelled to foresee and provide against that which reasonable and prudent men would not expect to happen. In the case at bar, the injury complained of could not have been anticipated and provided against by a reasonably prudent man, but was a pure accident. The plaintiff was injured by a blast of which he had ample warning and from which he had ample opportunity to escape, but took refuge in a place which he regarded as safe, and was injured in consequence of a peculiar rebound of a stump blown out by the blast, and hence cannot recover.

Error to a judgment of the Circuit Court of Dickenson county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*J. C. Smith, W. H. Rouse* and *E. M. Fulton,* for the plaintiff in error.

*Sutherland & Sutherland* and *Chase & Daugherty,* for the defendant in error.

Cardwell, J., delivered the opinion of the court.

This action was brought to recover damages for personal injuries alleged by the plaintiff, Frank Goble, suing by a next friend, to have been sustained by him as a result of the negligence of the defendant, the Yellow Poplar Lumber Company. There was a verdict and judgment in favor of the plaintiff, which this writ of error brings under review.

In the view we take of the case it is only necessary to consider the last of the several assignments of error, which calls in question the action of the trial court in refusing to set aside the verdict as contrary to the law and the evidence.

It appears from the record that the plaintiff, a well developed youth at least nineteen or twenty years of age and of average intelligence, sought and obtained employment with the defendant company in its work of constructing a tram or logging road on Russell Prater creek, in Dickenson county. He was a man in size and appearance, and was, therefore, presumably, capable of knowing and appreciating the dangers of the work in which he thus obtained employment, and he had worked for the defendant company a year before on like work upon another creek, and had been working at this particular place where he was injured about three days. The work of building this tram road consisted mainly in first digging and blasting out the material, so as to make the road bed, then in putting down the stringers and other superstructures. The work of making the road bed was necessarily to be done first, and was

followed by the laying of the stringers, etc., so as to make a complete superstructure over which logging trucks or cars were to be run, and the work of construction required a grading force or crew, a blasting crew, and behind them a stringer crew.

The plaintiff's employment was with the stringer force, and on the occasion of the injuries to him he had been at work with this force some distance behind, but in plain view of the place where the grading force were at work, and where the blast under a stump, which caused his injuries, was let off, of which timely notice and warning were given to him as well as to all others engaged in the work who might be or remain in a place of danger by reason of the blast. This blast was to be let off about six o'clock p. m., "quitting time," and the foreman of the grading crew, Ed. England, sent two men down to the point where the stringer crew was to tell them that the blast was to be let off, and all hands should get "plum out of the way." It was an established custom in such conditions to give the alarm of "fire" (which plaintiff clearly understood meant that a blast was to be set off), and when given the cry was taken up and repeated by others; and it was also the well established rule of the defendant company (known to all engaged in the work) that upon the alarm of "fire" being given, all employees were to see that every one was gotten out of danger. With every crew engaged in this work there was a foreman and a number of other laborers of long experience, one Orville Belcher being the foreman of the stringer crew with which the plaintiff was at work. Ample time to get out of the way of danger from said blast was unquestionably given and the warning, "fire," was taken up and repeated by others, including one Tackett, another workman engaged with a grading crew further down the creek from where Belcher's crew had been at work, and it is upon this repetition of the alarm by Tackett that the

plaintiff mainly relies for a recovery of damages in this action, since it is practically conceded that there was no cause of complaint of the conduct of England or his men."

Tackett's deposition was taken on behalf of and read in evidence by the plaintiff, and the reason for repeating the alarm is thus stated by him:

"Q. Why did you holler fire?

"A. There were fellows below us coming up that way. I knew they were going to shoot up there and didn't know whether they heard them or not."

All of the witnesses for the plaintiff as well as for the defendant company testify that according to the established rules governing the conduct of this work, employees engaged therein were to run and get away as fast as possible when notice that a blast was to be set off was given, or the alarm, "fire," heard; and that it was from four to five minutes after such notice or alarm was given until the blast would go off. The grading crew to which Tackett belonged were working in sight of plaintiff's crew the day of the accident to him, and there had been no blasting by Tackett's crew on that day, or within three or four days before. When England, who had been in charge of the blasting crew at work up the creek from where the plaintiff's crew were at work, had "sent two men down the line to tell everybody to get out of the way," and had seen Belcher's men (including the plaintiff) quit work, hang up their tools and start away before he left the stump that was to be blown out, came on down the line to about where Belcher's crew had been working, and then crossed over the creek, giving the signal to set fire to the blast just as he crossed over, and then went on till he reached a public road, a safe distance away and about two minutes before the blast went off. The creek was somewhat swollen from a recent rain, but there was little or no trouble in crossing it as England did. Some of plaintiff's witnesses who at

the time had been working with England's crew came down the line of work and along with the plaintiff and others got under a cliff, or shelving rock (called the "Goble cliff"), where they considered themselves safe. Belcher got out from under a rock where he first stopped and sought shelter thirty-five feet lower down, and asked the men under the "Goble cliff" to come down to where he was, but "they said they were all right." These men under the "Goble cliff" had not only ample time to have gone to where Belcher was before the blast went off, but could have gone on 350 or 400 yards further away and beyond all possible danger.

The distance from the blast to where plaintiff had been at work was about 410 feet; from the cliff where plaintiff sought safety to the cliff under which Belcher, his foreman, and others stopped, was about 39 feet; from the cliff under which the plaintiff took shelter to the end of the spur where Tackett repeated the alarm of "fire" was 169 feet; and from the log drift in the creek over which England passed, just above where plaintiff had been at work, across through a bottom and up the hillside to the county road 455 feet. Plaintiff himself states that Tackett's crew "was working in sight that day and there had been no blasting;" and that he had passed up and down the creek two or three times that day before being hurt. He further states that "he was entirely under the rock ('Goble cliff') but the stump bounced under and hit him." Other witnesses for the plaintiff who were with him at the time say that they got under the "Goble cliff" because they thought it safe, and the time fixed by them that they were under this cliff before the blast went off was about five minutes.

When the blast went off, the stump, under which it had been placed and fired, was blown into the air, and upon coming to the earth hit on the top or side of a cliff and

caromed under it, striking and injuring only the plaintiff and that part of his body, viz., his legs, which were not fully protected by the overhanging cliff.

The foregoing are the salient facts shown in the evidence certified in the record, considered under the rule governing its consideration by this court, and upon which the defendant company is charged with negligence in causing the injury for which compensation is sought in damages.

The essential grievances stated in the declaration are that the defendant company failed to provide a suitable and safe place for the plaintiff to work; that sufficient rules and regulations had not been adopted by the company and enforced for the protection of the plaintiff while engaged in the work.

The evidence proves nothing in the situation to suggest danger to any one engaged in the defendant company's work at the time and on the occasion of the accident to the plaintiff which had not been duly guarded against by well known rules governing employees engaged in carrying it on, and as remarked, his right to a recovery in this action must rest alone upon the theory that the repetition of the alarm, "fire," by Tackett confused the plaintiff and others, which caused them to seek shelter under the "Goble cliff" and not try to get further away from danger. No one knew better than the plaintiff, as his statement shows, that no blast had been prepared by Tackett's crew that day, and it is, therefore, inconceivable that he could have been confused by Tackett's repetition of the alarm given by England's men, and which Tackett, prompted by the dictates of humanity, repeated to those whom he saw approaching from below, and that too upon the most reasonable assumption by Tackett, that those to whom his warning was directed had not heard the cry of "fire" that had been put out by England and his men; and there was not the slightest reason for him to suppose that this act of his would

be misinterpreted by any one, especially as the stringer crew could see where he had been at work and in the ordinary course of events would know, by observation, that there was no blast to be let off by his crew; certainly, that there was no blast to be let off by him or his crew without, in accordance with the established rules of the company, sending some one up the line of work to give warning, as England had done.

It is inconceivable, as it appears to this court, that any management could have anticipated that an employee engaged in the work, as was the plaintiff, would become panic-stricken under such circumstances, and the fact, as disclosed by the plaintiff's own statement, is that he was not panic-tsricken or confused by Tackett's cry of "fire" and thus prevented from seeking protection elsewhere than under the "Goble cliff," but stopped where he did because he considered it safe to do so. It was clearly not for the want of time that the plaintiff got no farther away from the blast. England, after sending out notice of the impending blast had crossed the creek and gone 455 feet, 150 yards, and over, out into a public road, and Belcher had gotten out from under the rock where he first stopped and gone farther away and could have gone 350 or 400 yards farther before the blast went off; therefore the plaintiff remained, as did others, under the "Goble cliff," not because of the want of time to go elsewhere and farther away, but because they considered themselves fully protected, and they were, with the exception of the plaintiff, who was injured by an occurrence which could not have been foreseen or expected to happen by the exercise of ordinary or even extraordinary care.

It has been over and over repeated in the decided cases in this and other courts, that the negligence of the master cannot be inferred from the mere occurrence of an accident by which his servant is injured. That fact alone does not

raise even a *prima facie* presumption that the master has been guilty of negligence or a breach of duty to his servant. Negligence of the master is an affirmative fact to be established by the injured servant.

"Negligence must be established by affirmative evidence, which must show more than a mere probability of a negligent act. The existence of negligence must not be left wholly to conjecture, and, in determining whether or not an act or omission of the master was negligent, it must be borne in mind that the master is not compelled to foresee and provide against that which reasonable and prudent men would not expect to happen." *N. & W. Ry. Co.* v. *Witt,* 110 Va. 117, 65 S. E. 489; *N. & W. Ry. Co.* v. *McDonald,* 106 Va. 207, 55 S. E. 554, and authorities cited.

Our view of the evidence in this case is that it only shows that the plaintiff's injuries resulted from a pure accident that was not to be anticipated or provided against by reasonably prudent men, and for which injuries the defendant company cannot be held liable.

The judgment complained of must, therefore, be reversed, the verdict of the jury set aside, and the cause remanded for a new trial thereof, if the plaintiff be so advised, to be had not in conflict with the views expressed in this opinion.

*Reversed.*